Ronald DEL RAINE, Plaintiff–Appellant,

v.

Jerry T. WILLIFORD, Warden, United States Penitentiary, Marion, Illinois; Norman A. Carlson, Director, Federal Bureau of Prisons; Harold G. Miller, Former Warden, United States Penitentiary, Marion, Illinois; Kip Dillow; Patrick W. Keohane; John Brush; J.D. Lamer; Randel Burlison; Dr. Robert Denton, Carl S. Deer, Davis Whitaker (formerly P. Whitaker); Thomas J. Gora, L. Edwards, Charles Sansom, Jon Michael Moralez, Michael B. Walker, John Sullivan, John L. Clark, Larry Morrison, Joseph Sively, Thomas V. Krajenta, L. Sheffer, Guy Barker, T.R. Trusty, Gary Thompson, P. Pool, Steve R. Thomas, Lieutenant Wertenberger, D. Williams, Steve Pysher, John Doe I, John Doe II, Gary French (formerly known as John Doe III), and John Doe IV, Defendants–Appellees.

No. 92–1542.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1994.

Decided Aug. 9, 1994.

---

Southern District of Illinois listing nineteen employees of the Marion facility as defendants. The appellant listed sixteen of the defendant-appellees specifically by name and three defendant-appellees were listed as "John Doe" # 1, # 2 and # 3. The Federal Bureau of Prisons "locked down" the federal prison at Marion in 1983 and it has remained so, which has spawned a variety of decisions in the district court and here. *See Bruscino v. Carlson,* 654 F.Supp. 609 (S.D.Ill.1987), *aff'd,* 854 F.2d 162 (7th Cir.1988), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989); *Miller v. Henman,* 804 F.2d 421 (7th Cir.1987), *cert. denied,* 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987); *Campbell v. Miller,* 787 F.2d 217 (7th Cir. 1986), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986).

The appellant also filed an Amended Complaint asserting several more claims against a plethora of defendants including numerous additional prison employees not previously named in the original Complaint. There were procedural complications caused by the appellant's Amended Complaint. On September 23, 1985, the appellant filed a motion with the district court requesting the opportunity to be allowed to file a "composite" amended complaint. The appellant taped his amended handwritten allegations onto appropriate locations on the original typewritten Complaint, which had been cut apart and then entirely photocopied.

Additionally, there were service of process complications in this matter, which were exacerbated by the Amended Complaint. On June 9, 1986, Chief Judge Foreman upheld the Magistrate Judge Meyers' recommendation on this issue. Specifically, Chief Judge Foreman indicated that the appellant's effort to obtain service on April 12, 1986, was effectuated after the 120 day limit for service in light of the filing date of the Amended Complaint. On this issue, Judge Foreman indicated that no good cause existed for late service. Specifically, he explained:

> Plaintiff's original complaint was filed on November 2, 1984, and on November 4,

Howard B. Eisenberg, Little Rock, AR (argued), for plaintiff-appellant.

Laura J. Jones, Asst. U.S. Atty., Crim. Div., Fairview Heights, IL, Christopher K. Wells, Asst. U.S. Atty. (argued), Benton, IL, for defendants-appellees.

Before RIPPLE and MANION, Circuit Judges, and SHARP, District Judge.[1]

## I.

ALLEN SHARP, District Judge.

This is a prisoner civil rights case filed under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. The plaintiff-appellant ("appellant"), Ronald Del Raine, is and has for a long time been an inmate at the United States Penitentiary at Marion, Illinois ("Marion"). In November, 1984, the appellant filed a complaint in the

---

1. The Honorable Allen Sharp, Chief Judge, United States District Court for the Northern District of Indiana, sitting by designation.

1985, plaintiff filed an amended complaint, in which he named several new defendants. Neither these defendants nor certain others originally named were ever served. The Magistrate held that because plaintiff failed to serve the defendants within 120 days of the filing of the complaint, as required by Rule 4(j) of the Federal Rules of Civil Procedure, those defendants should be dismissed without prejudice from the instant suit.

Plaintiff contends that on April 12, 1986, he mailed sixteen typed amended complaints, along with the United States Marshal Forms (U.S.M.–285 forms), to the United States Marshal's Office for service upon defendants. The sixteen complaints were returned by the Clerk's office because the submitted copies did not match the original amended complaint in the Court's file. (Apparently, the Court's copy was partially typed, and the copies submitted by plaintiff for service were completely typed.) Although plaintiff attempted to serve defendants on April 12, 1986, this was nevertheless more than 120 days after the filing of the amended complaint. Plaintiff has not shown good cause why service was not made within the required period, and the Court therefore agrees with the Magistrate that defendants Brush, Deer, Denton, Gora, Edwards, Sansom, John Doe Guards, Sullivan, Clark, Morrison, Sively, Krajenta, Sheffer, Barker, Wertenberger, Williams, John Doe No. 4, Pysher, Thompson, Pool and Thomas should be dismissed without prejudice from the instant suit. The Court also finds that because defendant Trusty was never served, he should likewise be dismissed without prejudice.

*See Brief and Appendix of Plaintiff–Appellant* at Appendix 21–22.

On June 25, 1986, Magistrate Judge Meyers ruled on the defendant-appellees' motion to dismiss or for summary judgment.[2] In so doing, the Magistrate Judge resolved several issues. This court notes that it is helpful to discuss the specific defendant-appellee, the allegations, and the disposition of the district court concurrently. The appellant asserted an Eighth Amendment claim against defendant-appellee Harold G. Miller, the Warden at Marion during the lockdown, insofar as Miller failed to repair the windows in his cell block. In dismissing this claim, the Magistrate Judge explained that these allegations were not unconstitutional because the cold did not endanger the appellant's health and was merely uncomfortable. The Magistrate Judge further found that Miller could not be found liable under the doctrine of *respondeat superior* for supervising other defendant-appellees who may have violated the appellant's constitutional rights.

The Magistrate Judge also dismissed the action as to defendant-appellee Norman Carlson (Director, Federal Bureau of Prisons). The Magistrate Judge found that Carlson's supervision of prison employees did not constitute a constitutional violation. The Magistrate Judge also dismissed the appellant's claim against defendant-appellee Jerry Williford (Miller's successor as Warden at Marion) and defendant-appellee Patrick Keohane for the same reasons. Additionally, the Magistrate Judge dismissed defendant-appellee Randel Burlison (correctional officer). Finally, the Magistrate Judge evaluated the appellant's allegation that defendant-appellee Davis Whitaker (correctional officer) confiscated two dictionaries and other property. On this issue, the Magistrate Judge explained that because this claim could be pursued under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* it could not be asserted in a *Bivens* action. Therefore, the Magistrate Judge dismissed this claim.

The Magistrate Judge refused to dismiss or grant summary judgment on the appellant's Eighth Amendment claim against Kip Dillow and the appellant's First Amendment claim against Warden Williford. The appellant attempted unsuccessfully to appeal the

---

**2.** It is difficult for this court to ascertain whether the Magistrate Judge dismissed some of these claims under Federal Rule of Civil Procedure 12(b)(6) or Rule 56. It is possible that "[w]ithout expressly saying so, the district court by granting summary judgment, effectively on the pleadings, treated the motion as one to dismiss under [Rule] 12(b)(6)." *Johnson v. Pelker,* 891 F.2d 136 (7th Cir.1989). *See also DeMallory v. Cullen,* 855 F.2d 442, 445 (7th Cir.1988).

dismissal of the other claims, but this Court dismissed the appeal for lack of finality.

On September 15, 1988 Magistrate Judge Frazier evaluated the Eighth Amendment rectal search issue and explained:

> The documents indicate that on November 7, 1983, plaintiff was suspected of concealing contraband. Warden Miller and Regional Director ... Ralston authorized Dillow to administer x-rays and a rectal probe of the plaintiff. Dillow does not recall the reason for the suspicion and was not responsible for investigating the reason for the search. Dillow did not authorize the searches and cannot perform rectal searches without prior administrative authorization.
>
> To the extent that plaintiff protests the propriety of the authorization of the searches, summary judgment should be entered in favor of defendant Dillow, as it is undisputed that he was not personally involved in the assessment of the suspicion against plaintiff or the decision to authorize the rectal and x-ray procedures.

*Id. Brief and Appendix of Plaintiff–Appellant* at Appendix 13–14. Additionally, the Magistrate Judge denied summary judgment on the appellant's Eighth Amendment claim that defendant-appellee Dillow performed the rectal search in an unprofessional manner. This issue went to trial. Following the submission of the appellant's case to the jury, the Magistrate Judge granted a directed verdict for the defendant-appellee finding that although the rectal search may have been "an unpleasant, uncomfortable, and degrading experience," absent some evidence that defendant-appellee Dillow "gratuitously inflicted pain for the purpose of causing harm," no constitutional deprivation was involved. *Id.*

The Magistrate Judge also determined that Warden Williford had a proper basis for prohibiting the appellant from receiving two issues of a publication entitled *The Marionette.* In so doing, the Magistrate Judge granted summary judgment in favor of Williford as to those publications; however, the Magistrate Judge denied a similar motion for purposes of another publication entitled *A New Iron Column.* On this issue, the defen-

dant-appellee, Williford, appealed and this court ruled that the defendant-appellee was entitled to qualified immunity. *See Del Raine v. Williford,* 952 F.2d 405 (7th Cir. 1992) (unpublished order). *See also Del Raine v. Carlson,* 153 F.R.D. 622 (S.D.Ill. 1994).

In light of the foregoing, the district court dismissed the entire case. The appellant filed a timely appeal. The case proceeded to briefing in this court, with the appellant appearing *pro se.* Following briefing, however, this court determined that counsel should be appointed. This court appointed Professor Howard B. Eisenberg, established a new briefing schedule, and directed that counsel brief four specific questions, in addition to any other issue of merit. His fine professional service was duly acknowledged at oral argument and is renewed here.

In asserting this action under *Bivens,* the appellant asserts an Eighth Amendment conditions-of-confinement claim alleging that in the period following the lockdown he was forced to inhabit a cold cell and was not given adequate clothing or blankets. The appellant also asserts an Eighth Amendment claim alleging that he was subjected to cruel and unusual treatment during a rectal search for contraband. In addition, the appellant maintains that his personal property, including legal materials, was confiscated, lost, destroyed, damaged or shipped out of the prison. Finally, the appellant also asserts a claim against various supervisory officials at Marion and in the Federal Bureau of Prisons.

**II.**

This court notes that the district court dismissed defendant-appellees Brush, Deer, Denton, Gora, Edwards, Sansom, John Doe Guards, Sullivan, Clark, Morrison, Sively, Krajenta, Sheffer, Barker, Wertenberger, Williams, John Doe No. 4, Pysher, Thompson, Pool, Trusty and Thomas pursuant to Rule 4(j) because the appellant failed to secure service on the abovementioned defendant-appellees within 120 days of the filing of his Amended Complaint on November 4, 1985. On this issue, the appellant claims

that "in light of the decision in *Sellers v. United States,* 902 F.2d 598, 602 (7th Cir. 1990), and the unique procedural history of this case, [there was] 'good cause' for not serving some [of the] defendants with process within 120 days of the [filing] date the Amended Complaint." *See Brief and Appendix of Plaintiff–Appellant* at 2.

In *Sellers, supra,* this court explained that the United States Marshal's Service is required to serve papers on behalf of inmates under Fed.R.Civ.P. 4(c)(2)(B)(i). *Id.* Specifically, the *Sellers* court explained:

> Prison guards do not want prisoners to have their home addresses, and the Bureau of Prisons is reluctant to tell prisoners even the current place of employment of their former guards. This is a sensible precaution, for prisoners aggrieved by guards' conduct may resort to extra-legal weapons after release if they do not deem the results of the litigation satisfactory. Prisoners also have friends not noted for their scruples. Although the Department of Justice affords means to learn the addresses of its employees in order to serve them, these are sufficiently complex that even lawyers often trip up. *See Lewellen v. Morley,* 875 F.2d 118 (7th Cir.1989). Our impression from a series of cases is that prisoners appearing *pro se* get the runaround, no matter how hard they try to follow the Department's preferred methods of inquiry. Having the Marshal serve the papers enables the case to proceed while holding in confidence information in which the guards have a strong interest. Because the Marshals Service is part of the Department of Justice, 28 U.S.C. § 561, it should have ready access to the necessary information.
>
> The Marshal needs from the prisoner information sufficient to identify the guard ("John Doe No. 23" won't do); once that information has been provided, the Marshal should be able to obtain a current business address and complete service. If the Department of Justice declines to furnish the address to its own employee the Marshal, that hardnosed attitude satisfactorily explains a prisoner's inability to serve papers within 120 days. How is the

prisoner to obtain information the Bureau of Prisons will not entrust to a Marshal? We join the Ninth Circuit in holding that when the district court instructs the Marshal to serve papers on behalf of a prisoner, the prisoner need furnish no more than the information necessary to identify the defendant. *Puett v. Blandford,* 895 F.2d 630, 635 (1990). The Marshal's failure to accomplish the task is automatically "good cause" within the meaning of Rule 4(j). *See also Romandette v. Weetabix Co.,* 807 F.2d 309, 311 (2d Cir.1986); *Rochon v. Dawson,* 828 F.2d 1107, 1109–10 (5th Cir. 1987); and *Mondy v. Secretary of the Army,* 269 U.S.App.D.C. 306, 845 F.2d 1051, 1053 (D.C.Cir.1988), all holding that an indigent prisoner representing himself is entitled to rely on the Marshal to achieve service of process.

*Id.*

■ In *Sellers,* this court explained that "[r]ule 4(j) provides that a suit shall be dismissed without prejudice if the plaintiff fails to effect service within 120 days, unless the plaintiff shows good cause why such service was not made within that period." *Id.* Here, the appellant does not claim to have served the defendants within 120 days; rather, the appellant maintains that good cause existed for not effecting service of process. The district court here concluded that *no* good cause existed for the appellant's failure to serve the defendants within 120 days. This court reviews a district court's decision that no good cause existed for late service of process under an abuse of discretion standard. *Del Raine v. Carlson,* 826 F.2d 698, 705 (7th Cir.1987).

This court finds that a protracted discussion of *Sellers* is not necessary because the dispositive issue is not whether the Marshal was responsible for obtaining the defendant-appellees' addresses. Here, the dispositive issue is whether the appellant could have served the defendants within 120 days. Appellant did not provide the Marshal with copies of his Amended Complaint until April 12, 1986—more than 120 days after it was filed on November 4, 1985. Therefore, the failure to effect service within 120 days can not be blamed on the Marshal. Therefore,

this court concludes that the district court did not abuse its discretion in dismissing the abovementioned defendant-appellees.

### III.

■ The appellant maintains that the district court clearly erred when it dismissed appellant's claim that he was forced to remain in a "bitterly cold cell." The standard of review on this issue is *de novo.* On this issue, the appellant alleged:

> Every few days I'm striped searched in my cell (notwithstanding the bitter cold resulting from the open window above my cell), cuffed behind my back, pulled backwards from my cell, put in an empty cell while cuffed, from fifteen to thirty minutes, while my cell is ransacked i.e. personal property is stolen, legal papers mixed up, scattered, walked on, towels and sheets thrown on the floor. This practice continues to the present time. On December 23, 1983 while the chill factor was minus 40 degrees to 50 degrees below zero, according to the radio weather reports, I was strip searched and placed in an empty cell while my cell was ransacked. No hats, jackets, or gloves were allowed, nor could we put a blanket over our cell bars to warm the cell. Many other days were also bitterly cold. Repeated requests to Unit Manager Deer, Associate Warden Keohane, and Warden Miller to close the windows and fix broken ones were futile.

*See Brief and Appendix of Plaintiff–Appellant* at 28.

In *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court, speaking through Justice Souter, discussed the definition of deliberate indifference for purposes of the Eighth Amendment. An extensive quotation therefrom is in order:

> Although we have never paused to explain the meaning of the term "deliberate indifference," the case law is instructive. The term first appeared in the United States Reports in *Estelle v. Gamble,* 429 U.S., at 104 [97 S.Ct. at 291], and its use there shows that deliberate indifference describes a state of mind more blameworthy than negligence. In considering the

inmate's claim in *Estelle* that inadequate prison medical care violated the Cruel and Unusual Punishments Clause, we distinguished "deliberate indifference to serious medical needs of prisoners," *ibid.,* from "negligence in diagnosing or treating a medical condition," *id.,* at 106 [97 S.Ct. at 292], holding that only the former violates the Clause. We have since read *Estelle* for the proposition that Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319, 89 L.Ed.2d 251, 106 S.Ct. 1078, 1084 (1986).

> While *Estelle* establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. That point underlies the ruling that "application of the deliberate indifference standard is inappropriate" in one class of prison cases: when "officials stand accused of using excessive physical force." *Hudson v. McMillian,* 503 U.S., at [—— ——] [112 S.Ct. at 998–999]; *see also Whitley, supra* [475 U.S. at] 320 [106 S.Ct. at 1084]. In such situations, where the decisions of prison officials are typically made " 'in haste, under pressure, and frequently without the luxury of a second chance,' " *Hudson v. McMillian, supra,* [503 U.S.] at [——, 112 S.Ct. at 998] (quoting *Whitley, supra,* [475 U.S.] at 320 [106 S.Ct. at 1084] ), an Eighth Amendment claimant must show more than "indifference," deliberate or otherwise. The claimant must show that officials applied force "maliciously and sadistically for the very purpose of causing harm," 503 U.S., at [——, 112 S.Ct. at 998] (internal quotation marks and citations omitted), or, as the Court also put it, that officials used force with "a knowing willingness that [harm] occur," 503 U.S., at [——, 112 S.Ct. at 999] (internal quotation marks and citation omitted). This standard of purposeful or knowing conduct is not, however, necessary to satisfy the mens rea requirement of deliberate indifference for claims chal-

lenging conditions of confinement; "the very high state of mind prescribed by *Whitley* does not apply to prison conditions cases." *Wilson, supra,* [501 U.S.] at 302–303 [111 S.Ct. at 2326–2327].

With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. *See, e.g., LaMarca v. Turner,* 995 F.2d 1526, 1535 (CA11 1993); *Manarite v. Springfield,* 957 F.2d 953, 957 (CA1); *Redman v. County of San Diego,* 942 F.2d 1435, 1443 (CA9 1991); *McGill v. Duckworth,* 944 F.2d at 347; *Miltier v. Beorn,* 896 F.2d 848, 851–852 (CA4 1990); *Martin v. White,* 742 F.2d 469, 474 (CA8 1984); *see also Springfield v. Kibbe,* 480 U.S. 257, 269, 94 L.Ed.2d 293, 107 S.Ct. 1114 [1120] (1987) (O'CONNOR, J., dissenting). It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

That does not, however, fully answer the pending question about the level of culpability deliberate indifference entails, for the term recklessness is not self-defining. The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. *See Prosser and Keeton* § 34, pp. 213–214; *Restatement (Second) of Torts* § 500 (1965). The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware. *See R. Perkins & R. Boyce, Criminal Law* 850–851 (3d ed. 1982); *J. Hall, General Principles of Criminal Law* 115–116, 120, 128 (2d ed. 1960) (hereinafter Hall); *American Law Institute, Model Penal Code* § 2.02(2)(c), and Comment 3 (1985); *but see Commonwealth v. Pierce,* 138 Mass. 165, 175–178 (1884) (Holmes, J.) (adopting an objective approach to criminal recklessness). The standards proposed by the parties in this case track the two approaches (though the parties do not put it that way): petitioner asks us to define deliberate indifference as to what we have called civil-law recklessness, and respondents urge us to adopt an approach consistent with recklessness in the criminal law.

We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. *See Prosser and Keeton* §§ 2, 34, pp. 6, 213–214; *see also Federal Tort Claims Act,* 28 U.S.C. §§ 2671–2680; *United States v. Muniz,* 374 U.S. 150, 10 L.Ed.2d 805, 83 S.Ct. 1850 (1963). But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id.*

It is of no small moment that Justice Thomas, concurring in *Farmer v. Brennan* in —— U.S. at —— n. 2, 114 S.Ct. at 1991 n. 2 states:

I do not read the remand of that portion of the Court's opinion to intimate that the courts below reached the wrong result, especially because the Seventh Circuit has long followed the rule of law the court lays down today. *See McGill v. Duckworth,*

944 F.2d 344 (CA7 1991); *Duckworth v. Franzen*, 780 F.2d 645 (CA7 1985).

*Id.*

Before wading into the specifics of this issue, this court notes that in *Chandler v. Baird*, 926 F.2d 1057 (11th Cir.1991), the Eleventh Circuit, a case decided before *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), speaking through Judge Coffin, considered an Eighth Amendment claim that has several parallels to the issue before this court. Specifically, in *Chandler*, the plaintiff indicated that he was "confin[ed] in a cold cell with no clothes except undershorts and with a plastic-covered mattress without bedding, [*inter alia*]." *Id.* at 1063–66. In addition, the *Chandler* court explained that "[t]he averments of a cold cell were supplemented by specifics: that the temperature was as low as 60 degrees, that it was 'ice cold,' that plaintiff slept on the floor and on occasion huddled with a roommate, sleeping between two mattresses." *Id.* The *Chandler* court also explained that "[t]here was, of course, evidence to the contrary." *Id.* Specifically, the deposition of a prison official indicated "that the temperature in plaintiff's cell was governed by the same thermostat that controlled areas occupied by nurses and dispatchers and that no one had complained of the temperature." *Id.* The prison official "admitted, however, that people in these areas were clothed...." *Id.*

On this issue, the *Chandler* court explained that the district court "stated that 'where a plaintiff is provided with adequate food, clothing, and sanitation, the conditions of solitary confinement do not on their face violate the Eighth Amendment.'" *Id.* In concluding that the "plaintiff is entitled to have the trier of fact determine whether the [conditions-of-confinement violate the Eighth Amendment]," the *Chandler* court explained that "[w]e suspect that the district court was beguiled by a simplistic trilogy of conditions that, while convenient as illustrative shorthand, cannot preclude a fact-intensive inquiry under constitutional standards." *Id.*

In determining that this claim was not appropriately decided by the district court, the *Chandler* court discussed the relevant caselaw in the Eleventh Circuit, and then surveyed the relevant caselaw of other Courts of Appeals:

Other circuits have for some time recognized the temperature factor in assessing conditions of confinement. As far back as 1967, the Second Circuit reversed dismissal of a prisoner's complaint of exposure to extreme cold. *Wright v. McMann*, 387 F.2d 519 (2d Cir.1967). Subsequently, it affirmed on the merits a finding of cruel and unusual punishment in confining an inmate for eleven days, naked, without soap, towels, or toilet paper, and without bedding of any kind, forcing the inmate to sleep · on the floor, the temperature being "sufficiently cold to cause extreme discomfort". *Wright v. McMann*, 460 F.2d 126, 129 (2d Cir.1972).

Similarly, the Fourth Circuit, sitting en banc, found two sets of conditions of confinement involving the same prison inmate to violate the Eighth Amendment. *McCray v. Burrell*, 516 F.2d 357 (4th Cir.1975). In the first, the inmate was confined for two days in a cell where a concrete slab was initially the inmate's bed. A mattress was furnished later during the first night, but no blankets were supplied. Although the record did not disclose the temperature in the cell, it was so cold that the inmate tore open the mattress and nestled inside. The inmate also was denied articles of personal hygiene. *Id.* at 365–66. The court held that in the case of an ordinary prisoner, these conditions were violative of the Eighth Amendment; the only justification would be such mental derangement on the part of the inmate that self-harm was a real danger, in which case immediate contact with a psychologist/psychiatrist was required. *Id.* at 368–69. The second set of conditions included another two-day confinement in a cell without clothing, blanket, or mattress, where the inmate claimed sleep was impossible and that he had to stand up most of the first night. He was also denied articles of personal hygiene. *Id.* at 367, 369. The court held that these conditions, too, violated the inmate's Eighth Amendment rights in the absence of mental derangement.

The Eighth Circuit has faced a situation similar to that now before us. *See Maxwell v. Mason*, 668 F.2d 361 (8th Cir.1981). The court affirmed a finding of cruel and unusual

punishment in the confinement of an inmate to fourteen days in a solitary cell with no clothing except undershorts and no bedding except a mattress. Corrections officers had testified that the temperature would have been at least 70 degrees, but the inmate had "testified that he huddled in the corner of his cell to stay warm." *Id.* at 363. The court referred to its earlier decision in *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194, 207–8 (8th Cir.1974), in which the court stated that prisoners in punitive solitary confinement should not be "deprived of basic necessities including light, heat, ventilation, sanitation, clothing and a proper diet," and affirmed a denial of qualified immunity for two penitentiary officials. 668 F.2d at 365.

Finally, the Seventh Circuit has addressed two similar situations. In the first case, it reversed dismissal of a prisoner's complaint which alleged being placed in solitary confinement for three days without mattress, bedding, or blankets and without articles of personal hygiene. *Kimbrough v. O'Neil,* 523 F.2d 1057 (7th Cir.1975). In a more recent case, the court set aside summary judgment in *Lewis v. Lane,* 816 F.2d 1165 (7th Cir. 1987), where two state prisoners alleged that the heat in their cells was maintained at an unreasonably low temperature during December 1983 and January 1984, *id.* at 1166, and that the lack of heat was "severe enough to produce physical discomfort," *id.,* at 1171 n. 10. Although an affidavit of officials averred that the temperature was always checked when complaint was made and always found to be between 68 and 72 degrees, the court said:

> An allegation of inadequate heating may state an eighth amendment violation. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir.1980) ("a state must provide ... reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing)") ....

*Id.* at 1171 (footnote omitted).

We conclude from this body of caselaw that plaintiff is entitled to have the trier of fact determine whether the conditions of his administrative confinement, principally with regard to the cell temperature and the provision of hygiene items, violated the minimal standards required by the Eighth Amendment. We also conclude, although the district court did not reach the issue, that the right of a prisoner not to be confined in a cell at so low a temperature as to cause severe discomfort and in conditions lacking basic sanitation was well established in 1986. The defendants therefore were not entitled to summary judgment on the basis of qualified immunity. *Id.* This reasoning is in the same vein as *Farmer v. Brennan, supra.*

In considering the "defendants' Motion to Dismiss or in the Alternative for Summary Judgment," the district court in this case explained that the "[p]laintiff's claims against defendant-appellee Miller are that plaintiff requested defendant-appellee Miller to close windows and fix broken ones (plaintiff's Amended Complaint at Paragraph 11)...." *See Brief and Appendix for Plaintiff–Appellant* at Appendix 16–17. In finding that this claim "set forth [no] constitutional violation[ ]," the district court explained that "[u]nless continued cold temperatures endanger inmates' health, uncomfortable temperatures do not entail constitutionally inadequate housing." *Id.* (citing *Grubbs v. Bradley,* 552 F.Supp. 1052, 1122–23 (M.D.Tenn. 1982)).

In reviewing this historically complicated and very detailed prisoner civil rights case, this court notes the protracted time and effort requisite to claims of this ilk.[3] This court has reviewed the lengthy complaint and amended complaint filed by this petitioner. In the pursuit of justice in these matters, it is sometimes hard to separate the wheat from the chafe. On this issue, this court finds that the district court may have dismissed this claim on summary judgment without fully considering the ramifications of his finding on the objective component of the Eighth Amendment conditions-of-confinement test. In addition, this failure precipitated an insuf-

---

3. Most recently, the case of *Tucker v. Randall,* 840 F.Supp. 1237 (N.D.Ill.1993), clearly illustrates how close and difficult this issue truly is.

ficiency on the second part of the test—the subjective component. For purposes of the second part of the test, there is an arguable factual dispute barring summary judgment.

■ On the objective test, this court notes that the district court indicated that "[u]nless continued cold temperatures endanger inmates' health, uncomfortable temperatures do not entail constitutionally inadequate housing." *See Brief and Appendix of Plaintiff-Appellant* at 28–30. Although this is appealing on its face, this statement may not fully withstand prolonged scrutiny. To only find an Eighth Amendment violation from inadequate housing when the inmate's health is endangered suggests that frostbite, hypothermia, or a similar infliction is an absolute requisite to the inmate's challenge. Not so. In fact, as outlined by the appellant, this court in *Henderson v. DeRobertis*, 940 F.2d 1055 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1578, 118 L.Ed.2d 220 (1992), evaluated the issue of whether prison officials were entitled to qualified immunity for allowing prisoners to remain in freezing cells. The Seventh Circuit explained:

> In its judgment, the district court said it could not "find the right plaintiffs asserted under the facts of this case to have been clearly established in 1982 to remove defendants' qualified immunity." Nevertheless, the district court, in its ruling, noted pre–1982 cases where appellate courts held that the constitution required prisoners to be provided with adequate heat and shelter. For example, the district court cited *Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981) (prisoners are entitled to adequate shelter); *Wright v. Rushen*, 642 F.2d 1129, 1132–33 (9th Cir.1981) (an institution has eighth amendment obligation to provide prisoners with adequate shelter or quarters); *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir.1980) (the state must provide reasonably adequate heat to inmates), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68

L.Ed.2d 239 (1981); *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir.1978) (the court said that "an institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety"), *rev'd sub nom. Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Kirby v. Blackledge*, 530 F.2d 583, 587 (4th Cir.1976) (allegation of inadequate heating reaches the level of cruel and unusual punishment); and *Bell v. Wolfish*, 441 U.S. at 529 n. 11, 99 S.Ct. at 1869 n. 11. Plaintiffs cite additional cases in support of the same proposition. *See Bono v. Saxbe*, 620 F.2d 609 (7th Cir.1980) (the court said that insufficient heat is a factor frequently crucial to finding cruel and unusual punishment); *Gates v. Collier*, 501 F.2d 1291, 1300–01 (5th Cir.1974) (the court found that the "bathroom, kitchen, heating and housing facilities [were constitutionally] inadequate."). These pre–1982 cases describe a clearly established constitutional right of prison inmates to adequate heat. Thus, there was no question that in 1982 a reasonable prison official would have known of a prisoner's constitutional right to adequate protection from extreme cold.

*Id.*

■ The appellant alleges that he made numerous requests to various prison officials to fix the broken windows. He further alleges that the temperature in his cell was not much higher than the temperature outside and the temperature outside was, according to the appellant, forty or fifty degrees below zero with the wind chill.[4] This supports an inference that prison officials failed to provide adequate heat and shelter. This court finds that the appellant has outlined several facts in the Amended Complaint which, taken together, are sufficient for purposes of meeting the threshold showing of a serious deprivation under the objective component. *See*

---

4. The appellant filed a *Motion for Court to Take Judicial Notice* on February 7, 1994. The plaintiff obtained certified copies of climatic conditions for the Southern Illinois Airport in Carbondale, Illinois, the closest reporting station to the United States Penitentiary at Marion, for December 23 and 24, 1983. The report confirms the

plaintiff's discussion of the temperature for purposes of his Eighth Amendment conditions of confinement claim. This court granted the motion. The motion, however, was not considered as part of this court's discussion of this claim. It may be useful to the district court on remand.

*Helling v. McKinney*, — U.S. —, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (Eighth Amendment claim predicated upon involuntary exposure to environmental tobacco smoke). It is axiomatic that the court must view the record in the light most favorable to the nonmoving party. In light of the foregoing, this court finds even in this close case that it was improper to grant summary judgment on the objective test based on the dearth of available information.

 This court also finds that a consequence of the district court's finding on the objective component was that the subjective component was not considered by the district court. Therefore, this court must evaluate the evidence adduced for purposes of summary judgment on the issue of the subjective component. Here, this court notes that the constitutional scienter for an Eighth Amendment conditions-of-confinement claim is deliberate indifference. The record is relatively undeveloped on this issue. The appellant does indicate that at one point he was given a blanket, however, the appellant also indicates that several windows were broken allowing outside air during the winter into his cell. The reaction of the relevant prison officials to the knowledge of the broken windows and the accompanying temperature in the cell block may not have been considered by the district court. *See Jamison–Bey v. Thieret,* 867 F.2d 1046 (7th Cir.1989). It may also be relevant to know who broke the windows and when. Therefore, this court finds that material issues of fact exist concerning whether certain relevant prison officials displayed deliberate indifference. The fact that the appellant was provided with one blanket does not in and of itself preclude this court's finding. Certainly, such a fact inures to the benefit of the prison officials; however, there are too many other unresolved factual questions to make a dispositive declaration on deliberate indifference. Therefore, based upon the record as it now stands in this case, this court must determine that issues of material fact exist concerning the extent of the efforts that certain relevant prison officials made to provide adequate heat and shelter.

In *Lewis v. Lane,* 816 F.2d 1165 (7th Cir. 1987), this court, speaking through Judge Cudahy, considered an Eighth Amendment claim wherein "the plaintiffs alleged that the prison administrators maintained the heat in their cells during the months of December 1983 and January 1984 at an unreasonably low temperature." *Id.* at 1166. While much of that opinion is dedicated to expressing the court's chagrin at the appointed counsel's lack of effort and diligence in the matter, the *Lewis* court ultimately vacated the decision to grant summary judgment on the conditions-of-confinement. On this issue, the *Lewis* court indicated that "[a]n allegation of inadequate heating may state an eighth amendment violation." *Id.* at 1171. (citation omitted). In reviewing the affidavits, the *Lewis* court explained "[a]n assistant warden at Menard stated in an affidavit accompanying the state's motion to dismiss that the heat in the condemned unit was checked each time a complaint was made and that the temperature was always found to be within the range of 68 to 72 degrees." *Id.* The *Lewis* court added "[b]y contrast, [the plaintiff's] affidavit, which accompanied the *pro se* complaint, claimed that the temperature at times fell to between 52 and 54 degrees." *Id.* Therefore, the *Lewis* court explained that "[a] review of the *pro se* complaint and attached affidavits suggests that plaintiffs, with the assistance of counsel, may be able to raise genuine issues of material fact, making summary judgment inappropriate." *Id.* at 1171. So it is here.

In *Harris v. Fleming,* 839 F.2d 1232 (7th Cir.1988), this court evaluated an Eighth Amendment claim based on the conditions-of-confinement. In *Harris,* this court, speaking through Judge Wood, suggested

We recently stated, citing *Ramos,* that a claim of inadequate heating, or a guard's practice of banging on the bars, may state an eighth amendment violation. *Lewis v. Lane,* 816 F.2d 1165, 1171 (7th Cir.1987). In *Lewis* we held, as Harris points out, that summary judgment was inappropriate. One reason for that holding was that appointed counsel had grossly neglected the case. More importantly for the purposes of this case, however, *Lewis* involved prison policies and practices affecting all prisoners and not just an isolated instance

of negligence temporarily inconveniencing only one inmate.

\* \* \* \* \* \*

The circumstances of this case demonstrate some neglect and indifference on Menard's part, but the conditions were temporary and affected only one inmate. Although Harris experienced considerable unpleasantness, he suffered no physical harm. Menard's policies in these areas of responsibility, as reflected by the affidavits, are constitutionally acceptable if prison officials observe them. Harris does not dispute the truth of the affidavits. The defendants' temporary neglect of Harris's needs was not intentional, nor did it reach unconstitutional proportions. The defendants did not act in a deliberate and reckless manner, in the criminal law sense. *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Although Menard may merit some management criticism, at this stage the defendants' conduct is not unconstitutional, as indifferent and inconsiderate as it was in regard to this one inmate. The fact that other inmates have not joined this suit suggests its singularity. This observation, of course, should not be taken to mean that conduct affecting only one inmate may never be unconstitutional.

*Id.*

This court notes that while *Lewis, supra,* and *Harris, supra* may be instructive on this issue, the evaluation of Eighth Amendment conditions-of-confinement cases evolved considerably in 1991. That year, the Supreme Court issued the opinion in *Wilson v. Seiter, supra,* in which Justice Scalia underscored the importance of deliberate indifference in the evaluation of Eighth Amendment conditions-of-confinement cases. Here, the district court did not have the advantage of Justice Scalia's very elaborate decision when it considered appellant "bitter cold cell" claim. To be sure, this court has waded into this area on numerous occasions as illustrated by many of the above-mentioned cases, and the notion of deliberate indifference is more extensively developed now than it was in 1986, when the district court decided this

issue. Certainly, the district court did not have the benefit of *Farmer v. Brennan.*

In *Jackson v. Duckworth,* 955 F.2d 21 (7th Cir.1992), this court, speaking through Chief Judge Posner, evaluated whether a "claim of cruel and unusual punishment presents a genuine issue of material fact." *Id.* at 22. The *Jackson* court explained that "[b]oth parties treat this as a 'subhuman conditions' case, and focus on the objective inhumanity of the conditions." In addition the court explained:

> The prisoner's affidavit states that he was forced to live with "filth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, [and] ... drinking water containing small black worms which would eventually turn into small black flies." The defendants have presented sworn denials of these conditions, but summary judgment is not a procedure for resolving a swearing contest. *Chandler v. Baird,* 926 F.2d 1057 (11th Cir.1991); *Lewis v. Lane,* 816 F.2d 1165, 1171 (7th Cir.1987).

*Id.*

In further evaluating this issue, the *Jackson* court detailed the requisite considerations on the state of mind requirement:

> But, we emphasize, there is more to a subhuman-conditions case than subhuman conditions. "Punishment," for purposes of determining tort liability under 42 U.S.C. § 1983 for violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishments, has both an objective and a subjective component. The objective component is the nature of the acts or practices alleged to constitute cruel and unusual punishment. Are they such acts or practices as would be deemed cruel and unusual if prescribed in a state or federal statute as the lawful punishment for a particular offense? The answer is "yes" if Jackson's affidavit is truthful, because in our contemporary society it would be considered barbarous to imprison a criminal in conditions so strikingly reminis-

cent of the Black Hole of Calcutta. *Ramos v. Lamm,* 639 F.2d 559, 567–72 (10th Cir.1980).

The subjective component of unconstitutional "punishment" is the intent with which the acts or practices constituting the alleged punishment are inflicted. The minimum intent required is "actual knowledge of impending harm easily preventable." *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985) (emphasis added); *see Wilson v. Seiter,* [501 U.S. 294], 115 L.Ed.2d 271, 111 S.Ct. 2321 (1991); *McGill v. Duckworth,* 944 F.2d 344 (7th Cir.1991). A failure of prison officials to act in such circumstances suggests that the officials actually want the prisoner to suffer the harm. If the harm is remote rather than immediate, or the officials don't know about it or can't do anything about it, the subjective component is not established and the suit fails. *See, e.g., Wilson v. Seiter, supra,* [501 U.S. at 301], 111 S.Ct. at 2326. Jackson's affidavit states, and the defendants do not deny, that the defendants visited his unit routinely, observed the conditions described in it, but failed to take adequate corrective measures. The defendants deny that the conditions were as Jackson described them and claim to have corrected the minor problems (such as infestation by roaches) that they acknowledge existed, but they do not suggest that any condition beyond their control would have prevented them from correcting the conditions that Jackson claims existed. There thus are triable issues concerning both the ghastliness of the conditions and the state of mind of the defendants.

*Id.*

In light of the foregoing, this court remands this particular claim to the district court for further action in compliance with this opinion and with the demands recently announced in *Farmer v. Brennan.* Certainly, it may be reconsidered under Rule 56 in advance of any trial on the merits.

### IV.

■ Next, the appellant maintains that the district court erred in granting a directed verdict at trial on the claim of an improper rectal search. The appellant contended that he had been subjected to an unconstitutional digital rectal probe by defendant-appellee Kip Dillow, a physician's assistant at the Marion facility. Specifically, the appellant testified in the following fashion:

[A]fter the guards cuffed me behind my back and grabbed my arms, they rushed me on down to the hospital. They opened the door. I went in. They took me in. People were standing around on the bottom floor of the hospital, not the second floor, not in an examination room; an open foyer, adjacent to the toilets and the sink ... That's where that rectal probe occurred ... this was a probe. It was not just an examination. A gloved finger, lubrication, hard, around and around, and I'm trying to raise up on my toes and I didn't say anything. That's true. I'd better not say anything. The guards are holding me, and they're there. The claim it was for contraband. I did not have any contraband.

*See Brief and Appendix of Plaintiff–Appellant* at 39. (Transcript of June 6, 1989 Jury Trial, page 122).

After taking evidence and hearing the testimony of both the appellant and defendant-appellee Dillow at the jury trial, the Magistrate Judge outlined the relevant facts:

Viewed in plaintiff's favor, the evidence shows that the rectal search was performed in a lobby area on the first floor of USP–Marion's medical hospital, with guards and possibly other medical personnel present. Defendant Dillow did not participate in the decision to conduct the rectal search nor to obtain x-rays and had no authority to direct the number of security guards who would witness the rectal examination. Plaintiff was brought to the medical unit handcuffed and wearing shorts and socks. Plaintiff was bent over a table, his shorts were "jerked" to his knees, and Dillow performed the rectal probe using a gloved finger and lubricant. The search caused plaintiff discomfort. After completing the search, Dillow neglected to remove excess lubricant. Plaintiff was then directed to an x-ray table,

and two x-rays were taken. Plaintiff's handcuffs were removed for the second x-ray. The second x-ray was taken before the first could be developed and evaluated. Plaintiff suffered no physical injury from the rectal search or x-rays but did feel humiliated and degraded by the experience. Plaintiff made no complaints of any kind during the search and never made complaints of physical injury resulting from the search.

*Id.* at Appendix 2–3.

Based on these facts, the Magistrate Judge granted a directed verdict for the defendant-appellee:

On these facts, there is no basis on which a jury could find that Dillow inflicted cruel and unusual punishment. By its very nature, a rectal search is likely to an unpleasant, uncomfortable, and degrading experience. Digital rectal searches are not condemned *per se*, however, *see Bruscino v. Carlson*, 854 F.2d 162 (7th Cir.1988); and until a kinder, gentler method of satisfying the particular security concern is devised, they will be conducted. Absent evidence that a rectal search is performed in a cruel, unsanitary, unprofessional, or injurious manner, there is no basis for a reasonable inference the Dillow gratuitously inflicted pain for the purpose of causing harm.

*Id.* at Appendix 3–4.

 It is important to note that this is "[t]he only issue that went to trial in this case," and the district court directed a verdict for the defendant-appellee. In *James v. Milwaukee County*, 956 F.2d 696, 698 (7th Cir.1992), this court explained the relevant considerations requisite to a review of the granting of a directed verdict,: "We review de novo a district court's grant of a motion for directed verdict. *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988)." A search of this nature falls under both the constitutional protections of the Fourth Amendment and the Eighth Amendment. *See Tribble v. Gardner*, 860 F.2d 321 (9th Cir.1988) ("If the search were conducted for purposes unrelated to security considerations, not only would it violate the fourth amendment, …, but also it may constitute cruel and unusual punishment under the eighth amendment."). It appears that the appellant only challenged the search based on the Eighth Amendment, and therefore, waived any Fourth Amendment challenge.

In *Bell v. Wolfish*, the Court, speaking through then Justice Rehnquist, discussed the ramifications of body cavity searches for purposes of the Fourth and Eighth Amendment. While the Fourth Amendment is not at issue here, it is instructive to note the Court explanations on this issue:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases.

*Id.*[5] *See also Campbell v. Miller*, 787 F.2d 217 (7th Cir.) (Fourth Amendment analysis

---

5. Several federal courts have evaluated body cavity searches on the basis of the Fourth Amendment right to be free from unreasonable searches and seizures. Several examples of such cases were outlined in *Criminal Procedure Project*, 81 *Georgetown Law Journal* 4 (1993) at 1630–32:

See *Bruscino v. Carlson*, 854 F.2d 162, 164–65 (7th Cir.1988) (policy requiring rectal searches of inmates returning to cells justified when body cavity searches continued to discover "astonishing quantity" of contraband, including

knives and hacksaw blades, and statistical evidence suggested that prison violence had declined since institution of policy), cert. denied, 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989); *Franklin v. Lockhart*, 883 F.2d 654, 656 (8th Cir.1989) (policy requiring visual body cavity strip searches of inmates on punitive status, in administrative segregation, and in need of protection justified by security concerns), and *Arruda v. Fair*, 710 F.2d 886, 886–88 (1st Cir.) (policy requiring strip searches of

of visual body cavity search), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986).

 This court notes that in *Bell v. Wolfish,* the Court indicated that "on occasion a security guard may conduct the search in an abusive fashion." *Bell v. Wolfish,* 441 U.S. at 560, 99 S.Ct. at 1885. To this, the Court added "[s]uch an abuse cannot be condoned," and therefore, "searches must be conducted in a reasonable manner." *Id.* (citations omitted). An Eighth Amendment application of this precept requires this court to focus on the words "abusive" and "reasonable." These words must be grafted onto the objective and subjective components of the Eighth Amendment. An application of *reasonableness* in this area often invokes a medical evaluation of the process. *Abusiveness* occurs when there is evidence of some palpable malevolence attributable to a prison official exacerbated by the lack of a justifiable penological objective for the search.

This court dealt with an abusive situation in *Meriwether v. Faulkner,* 821 F.2d 408, 418 (7th Cir.1987). In *Meriwether,* this court indicated that an Eighth Amendment claim was cognizable when a transsexual inmate alleged that she was strip searched before guards and other inmates for purpose of "calculated harassment unrelated to prison needs." *Id.* On this issue, the court explained that:

> With respect to plaintiff's claim that she is regularly forced to strip before guards and other inmates, it should be noted that while a prisoner's expectation of privacy is extremely limited in light of the overriding need to maintain institutional order and

security, *see Bell v. Wolfish,* 441 U.S. 520, 537, 558–60, 99 S.Ct. 1861, 1873 1884–85, 60 L.Ed.2d 447, the Supreme Court has recognized that a prisoner retains a remedy for "calculated harassment unrelated to prison needs." *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393. The Eighth Amendment's prohibition against cruel and unusual punishment stands as a protection from bodily searches which are maliciously motivated, unrelated to institutional security, and hence "totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59; see *Hudson,* 468 U.S. at 530, 104 S.Ct. at 3202, *Smith v. Chrans,* 629 F.Supp. 606, 610–11 (C.D.Ill.1986).

*Id.*

 This court has some mild reservations over the fact that the search of this appellant was not conducted in a private examination room instead of the "lobby area." However, in outlining the facts, the district court portrays a situation fraught with decisions made "in haste, under pressure, and frequently without the luxury of a second chance." *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). There is no evidence of any defendant-appellees taking this course of action in a "malicious[ ] and sadistic[ ] fashion for the very purpose of causing harm." *Id.* at 320–21, 106 S.Ct. at 1085. This court also notes that there are countervailing pressures upon prison officials conducting such searches. This court finds no evidence of "calculated harassment unrelated to prison needs." *Id.*[6]

security unit prisoners when entering or leaving unit to go to library or infirmary and after meeting visitors justified because prison operated under maximum security and unit houses most dangerous prisoner inmates), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983).
*Id.*

**6.** An Eighth Amendment claim of this nature may also be cognizable under the Fourth Amendment as it specifically relates to privacy. For example, in *Cornwell v. Dahlberg,* 963 F.2d 912, 916–17 (6th Cir.1992), the Sixth Circuit evaluated whether the Fourth Amendment right to privacy was implicated when an inmate was strip-searched outdoors before several female correc-

tional officers after a prison uprising. On this issue, the *Cornwell* court explained:

> A convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners. *E.g., Bell v. Wolfish,* 441 U.S. 520, 558 [99 S.Ct. 1861, 1884, 60 L.Ed.2d 447] (1979); *Kent v. Johnson,* 821 F.2d 1220, 1226–27 (6th Cir. 1987) (collecting cases). Accordingly, in challenging the conditions of his outdoor strip search before several female OSR correctional officers, Cornwell raised a valid privacy claim under the Fourth Amendment that was proper-

*See also Wetmore v. Gardner*, 735 F.Supp. 974 (E.D.Wash.1990) ("Testimony in the great majority of these cases [(digital rectal probe)] ... was that the prisoners were taunted by the search and escort officers with such statements as: 'Today, you meet Mr. Big Finger....'"). In addition, it is beyond question that there is a legitimate penological objective at issue here. Those objectives have been described by both the Supreme Court in *Bell v. Wolfish, supra* and in *Bruscino v. Carlson*, 854 F.2d 162 (7th Cir.1988) (this court specifically discussed the validity of rectal searches at the Marion facility). *See also Tribble v. Gardner*, 860 F.2d 321, 325 n. 5 (9th Cir.1988); *Daughtery v. Harris*, 476 F.2d 292, 295 (10th Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973).

The appellant also argues that the defendant-appellee conducted the rectal search in a manner violative of the Eighth Amendment insofar as the rectal search was conducted in an unnecessarily brutal, painful, and humiliating manner. This claim focus on the manner in which the search was conducted by the prison officials. On this issue, the appellant refers to a Ninth Circuit opinion articulated in *Vaughan v. Ricketts*, 859 F.2d 736 (9th Cir.1988).

In *Vaughan,* the Ninth Circuit refused to grant summary judgment on the question of qualified immunity insofar as there were clearly established standards that illustrated the parameters of a rectal search. The *Vaughan* court evaluated this claim under the rubric of *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), and indicated that the plaintiff "allege[d] that deliberate indifference to the inmates' medical needs was shown by the lack of hygiene during the searches, by the lack of training of the searchers, by the failure to check inmates' medical records before performing searches...." *Id.* at 741. This court finds that the above-mentioned procedures were followed in this search.

In arguing that the rectal search was an Eighth Amendment violation, the appellant argues that the district court failed to consider that the Eighth Amendment protects inmates against more than physical pain.

There is no question that such a search may be psychologically harmful and as the appellant in this case recounted—the search may be "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive...." *See Brief and Appendix of Plaintiff–Appellant* at 39. Undoubtedly, every inmate having to submit to a rectal search bears this psychological harm. However, the fact of the matter is that rectal searches in the prison are necessary, and therefore, such psychological harm is unavoidable.

In light of the foregoing, this court finds that the appellant's Eighth Amendment rights have not been contravened by the

ly submitted to the jury. In short, Cornwell's only outstanding Fourth Amendment claim to which the court's charge can apply is for the alleged violation of his limited right to privacy during the strip search.

In evaluating prison regulations that allegedly infringe on inmates' constitutional rights, the Supreme Court has set forth a completely different test: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 [107 S.Ct. 2254, 2261, 96 L.Ed.2d 64] (1987) (Emphasis added) (reviewing prison regulations regarding inmate to inmate correspondence and marriage); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 [107 S.Ct. 2400, 96 L.Ed.2d 282] (1987) (challenge to regulations under Free Exercise clause applies same standard).

The "rational relationship" standard affords prison officials great flexibility to establish policies that would best balance the penological interests of the institution with the constitutional rights of the inmates. *Turner, supra,* 482 U.S. at 89 [107 S.Ct. at 2261]. In determining whether the prison policy is reasonably related to some legitimate penological interest, courts have enumerated several factors for consideration, including (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation to these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation. *Id. see also Jordan v. Gardner*, 986 F.2d 1521 (9th Cir.1993); *Covino v. Patrissi*, 967 F.2d 73, 78–79 (2d Cir.1992); *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir.1992) (per curiam).

above-mentioned search. This court should note that the appellant also argues that "forced digital rectal examinations [should] be ended." *Brief and Appendix of Plaintiff–Appellant* at 41–42. Specifically, the appellant explains that "independent consultants retained by the House Judiciary Committee who recommended that the forced rectal probes be halted and noted the 'potential danger of damage or infection to the lower segment of the large intestine or the prostate gland.'" *Id.* There is no indication that such preliminary legislative recommendation was ever embodied in legislation which binds the prison officials in this case or for that matter, this court. The fact that alternative technology for rectal searches exists is irrelevant in this case.

The appellant has challenged this search only on the basis of the Eighth Amendment. In *Bell v. Wolfish, supra,* the Court, in a footnote, explained that "[t]he District Court indicated that in its view the use of metal detection equipment represented a less intrusive alternative to cavity inspections." *Id.* 441 U.S. at 559 n. 40, 99 S.Ct. at 1885 n. 40. On that issue, the Court indicated that "in *United States v. Martinez–Fuerte,* 428 U.S. 543, 556–557, n. 12, 96 S.Ct. 3074, 3082–3083, n. 12, 49 L.Ed.2d 1116 (1976), [we noted] that '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" *Id. See also United States v. Oakley,* 731 F.Supp. 1363 (S.D.Ind.1990). Insofar as this claim focused on the Eighth Amendment, a Fourth Amendment claim of this nature is not germane to this court's consideration of this issue.

█ This court also notes that such an evaluation is tantamount to federal court micro-management of a penological facility. On this issue, this court notes that "[t]here was a time when federal courts did not intervene in the internal affairs of prisons at all." *Azeez v. Fairman,* 795 F.2d 1296 (7th Cir.1986). "[T]hough that time is past, even today these courts regulate prisons with a considerably lighter touch than they regulate other public institutions alleged to deprive their charges or wards ... of federal constitutional rights...." *Id.* at 1298. This court will not intervene in decisions within the purview of the warden and the Bureau of Prisons. The decision to initiate different methods to search for contraband is not for this court to make in this case.

This court notes that "[i]t cannot be questioned that the body cavities of prisoners are capable of secreting a surprising array of objects, and that inmates are willing to go to extreme lengths to obtain weapons and illicit drugs." *United States v. Oakley, supra* at 1369–72 (*See, e.g., Bruscino v. Carlson,* 654 F.Supp. 609, 620 (S.D.Ill.1987) (discussing the videotaping of two prisoners who were caught with hacksaw blades in their noses), *aff'd,* 854 F.2d 162 (7th Cir.1988), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989)). "The fact that prisoners are willing to place such dangerous objects into body cavities that most people rarely display to others demonstrates as much about the guile and bravado of certain prisoners as it does about the government's need to search, both visually and physically, such private areas of the body." *Id.* This court finds no Eighth Amendment violation in these facts.

### V.

█ The appellant maintains that the district court erroneously dismissed appellant's claim regarding lost and damaged personal property. The standard of review on this issue is *de novo.* The appellant made a number of allegations regarding the destruction, loss, damage, and disturbance of his books, property, and legal papers. However, most of these specific claims involve defendant-appellees who were dismissed for failure to effectuate service. The only lost property issue to survive dismissal for failure to effectuate service was against Correctional Officer Davis Whitaker.

The appellant outlined this claim in his Amended Complaint in the following fashion:

> On November 24, 1983, I was taken to the gymnasium and guard P. Whitaker let me keep some of my property. Most of it was to be mailed out of the prison. I twice asked [Davis] Whitaker if I could tear the covers off my dictionaries and keep them.

He said no. I later received a letter from my sister listing the items of property she had received. I saw several of my items at that time which were not sent to my sister nor given to me. Since my address book had been taken, I couldn't list an address to which to send the property. A few days later I found my sister's address on a correspondence form and sent it to Whitaker.

A dictionary was taken from me in 1972. Two more dictionaries were taken form me in October, November, 1983 (Paul Whitaker and John Doe Number Three, to the best of my knowledge and belief were responsible for this).

*See Brief and Appendix of Plaintiff–Appellant at 32.*

The district court disposed of this claim in a single sentence: "Assuming this action was improper, plaintiff's remedy is an action brought under the Federal Tort Claims Act, not a civil rights action. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)." *See Brief and Appendix of Plaintiff–Appellant.* at Appendix 19. On this issue, the appellant asserts that "[w]here a constitutional deprivation is the result of official policy or some culpable state of mind greater than mere negligence, [an] FTCA [action] is either inappropriate or, at the very most, is only an alternative remedy to a *Bivens* action." *Id.* In addition, the appellant maintains that "[w]hen the plaintiff seeks damages for a constitutional violation beyond mere compensation for actual loss, the FTCA can not apply, and the action must be brought as a *Bivens* action." *Id.*

The binding precedent on this issue is *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), a case emanating from this court. It affirmed this court's reversal of a district court dismissal. The decision of the district court here, at its beginning, is at odds with the basic holding of *Carlson v. Green.* In turn, the record must then be examined as to whether there is an arguable *Bivens* claim in regard to the lost dictionaries. Although the interplay between a *Bivens* remedy and one under the Federal Tort

Claims Act has been widely considered, it need not here delay us long. The most that the record here discloses with reference to lost or taken books is *possible* negligence and that is not enough for a constitutional claim under *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The Supreme Court in *Carlson v. Green,* declined to construct a stringent line of demarcation between a *Bivens* remedy and an FTCA remedy. The district court's ruling on this issue must be considered in light of *Carlson v. Green.*

 The *most important distinction* between a constitutional claim under *Bivens* and a claim filed under the FTCA is simply that in order to assert a claim in a *Bivens* action, there must be a constitutional violation at issue. *Compare Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Therefore, this court notes that if there are no constitutional rights contravened by the dictionary loss incident, then this appellant can not bring this action under *Bivens.* The appellant asserts that this incident "hampered his ability to pursue his extensive litigation." *See Brief and Appendix of Plaintiff–Appellant* at 36. In addition, the appellant asserts "that the seizure of [the p]laintiff's dictionaries violates [the] right of access to the courts in violation of *Bounds v. Smith,* 430 U.S. 817, 827, 97 S.Ct. 1491, 1497, 52 L.Ed.2d 72 (1977)." *Id.*

Recently, in *Alston v. DeBruyn,* 13 F.3d 1036 (7th Cir.1994), this court explained that "[i]t is well-established that inmates have a fundamental constitutional right of access to the courts." *Id.* (citing *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977)). "To prove a violation of the right of access to the courts an inmate must show (1) the failure of prison officials 'to assist in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law,' *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498, and (2) 'some quantum of detriment caused by the challenged conduct of state officials resulting in the interruption and/or delay of the plaintiff's pending or contemplated litigation.'" *Id.* citing *Shango v. Jurich,* 965 F.2d 289, 291 (7th

Cir.1992); *Jenkins v. Lane*, 977 F.2d 266, 268 (7th Cir.1992) (same). The fact of the matter here is that the law library in the Marion facility has "dictionaries for the prisoner's use." *See Brief for Defendant–Appellees* at 10. Not disputed. More importantly, this court finds little or no evidence of any quantum of detriment whatsoever. This appellant has had abundant access to the federal courts in this case and others.

■ The appellant also asserts a Fifth Amendment right to Due Process claim based on the dictionary incident. The appellant does not assert this claim very forcefully and presents *no* facts or caselaw on the issue of why it was incorrect for the district court to dispose of this claim by reference to *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Conversely, the defendant-appellee argues that "the Due Process Clause is not implicated when a property loss may be remedied through post-deprivation proceedings." *See Brief of Defendant–Appellees* at 10. This court has been down this road before in *Caldwell v. Miller*, 790 F.2d 589 (7th Cir.1986), and more recently, in *Sellers v. United States*, 902 F.2d 598 (7th Cir.1990).

In *Sellers v. United States, supra,* this court considered the ramifications of a claim very similar to the facts at issue here. In *Sellers*, after the "Bureau of Prisons 'locked down' the federal prison at Marion, Illinois, in 1983, it restricted the volume of personal materials inmates could keep in their cells." *Id.* at 600. "According to the plaintiff, somewhere in this process the guards stole or lost an oil painting of his wife, 41 law books, and almanac, [and some other personal possessions.]" *Id.* The appellant, in a *Bivens* action, asserted a claim against "three guards [and] also the warden on the theory that the loss violated the Constitution." *Id.*

In further evaluating such claim, in that case the court explained that "[o]n his own initiative, [the Magistrate Judge] substituted the United States as a defendant-appellee and converted the case from a *Bivens* action to one under the Federal Torts Claims Act [(FTCA)]." *Id.* The Magistrate Judge "later conducted a bench trial ... [and] con-cluded that the guard lost the almanac [and] the oil painting...." *Id.* at 601. Subsequent to a separate proceeding on damages and an administrative proceeding, the appellant appealed claiming that "the magistrate ignored his claim concerning the law books." *Id.*

In evaluating the above-mentioned events, this court, speaking through Judge Easterbrook, explained:

With respect to the law books, however, Sellers has a point. Although Fed. R.Civ.P. 52(a) requires the court to "find the facts specially", the magistrate did not mention Sellers' argument that the guards lost his books. Perhaps he overlooked the subject in the welter of confusing documents filed in this case. No matter the reason, however, we must remand for findings. Sellers' objections to the rulings admitting evidence of the inventories of his property are without substance, as is his contention that the defendants are liable on account of their refusal to send his possessions to Judge Fairchild. Federal judges are not prisoners' warehousemen. The only question on remand under the Tort Claims Act is whether the government tortiously lost Sellers' books, and the magistrate is free to make whatever ruling the record requires on this subject. One may question whether substantial investment of judicial time in a case of this sort is appropriate. The Federal Courts Study Committee, picking up a suggestion in *Free v. United States*, 879 F.2d 1535, 1536 (7th Cir.1989), has recommended that claims of less than $10,000 under the FTCA be handled by a new small-claims court. Report of the Federal Courts Study Committee 81 (1990). *See also Savage v. CIA*, 826 F.2d 561, 563 (7th Cir. 1987); *Tinker–Bey v. Meyers*, 800 F.2d 710 (7th Cir.1986). Until Congress acts on that recommendation, however, even the smallest claims concerning lost property must proceed using rules designed for large-stake cases.

*Id.*

Some of the facts in *Sellers* parallel those here. The alleged confiscated property at issue here and in *Sellers* arguably include

law books. Not so here. In *Sellers*, the district court *sua sponte* converted the case to an FTCA action. Here, the district court ruled that the appellant could pursue his claim under the FTCA, but not in a *Bivens* action. In doing so, the district court here was half right. In *Sellers*, the respondents argued "that the judgment with respect to the individual defendant-appellees may be affirmed on the alternative ground that because the [Federal] Tort Claims Act furnishes an adequate remedy, the Due Process Clause of the fifth amendment does not authorize a direct action against the jailers." *Id.* at 603. The *Sellers* court indicated:

> This reasoning parallels *Parratt v. Taylor*, 451 U.S. 527, 68 L.Ed.2d 420, 101 S.Ct. 1908 (1981) ..., and *Hudson v. Palmer*, 468 U.S. 517, 530–36, 82 L.Ed.2d 393, 104 S.Ct. 3194 [3202–3205] (1984). Although the United States Attorney acknowledges that *Carlson v. Green*, 446 U.S. 14, 64 L.Ed.2d 15, 100 S.Ct. 1468 (1980), rejected an argument that the FTCA ousted all *Bivens* suits within the scope of its coverage, he urges us to hold that it does not apply when the FTCA provides effective and complete remedies for negligent loss of property. He submits that *Carlson* has been overtaken by subsequent cases, not only *Parratt* and *Hudson*, but also others that have demonstrated greater willingness to infer from the provision of statutory remedies that direct constitutional actions are unnecessary or have been precluded. *See Schweiker v. Chilicky*, 487 U.S. 412, 101 L.Ed.2d 370, 108 S.Ct. 2460 (1988); *Bush v. Lucas*, 462 U.S. 367, 76 L.Ed.2d 648, 103 S.Ct. 2404 (1983); *Chappell v. Wallace*, 462 U.S. 296, 76 L.Ed.2d 586, 103 S.Ct. 2362 (1983). This is not the occasion to consider the question.

*Id.* It might well be added neither is this!

Essentially, the defendant-appellees in *Sellers* argued that the FTCA is an adequate but perhaps not an exclusive remedy under the due process rubric of *Parratt, supra.* Therefore, insofar as there is no constitutional violation, then there is no basis for a *Bivens* action. In *Sellers*, the appellant did not dispute the district courts's action of converting the case to an FTCA. Here, the

appellant does. To distill the argument even further, the defendant-appellees argue that the FTCA is the proper and exclusive remedy for dealing with the above-mentioned dictionary incident, while the appellant maintains that an action against the defendant-appellees directly under the Constitution as outlined in *Bivens* is the proper remedy.

In his Amended Complaint, the appellant admits that many of the confiscated items were mailed to his sister. The appellant points to a letter from his sister listing the items that she received from the prison. The presentation of the events in the appellant's Amended Complaint leads to the assertion that the sister did not receive the dictionaries.

It is important to note that the prison has specific guidelines for dealing with the confiscation of property belonging to inmates. This court addressed a very similar issue in *Caldwell v. Miller*, 790 F.2d 589 (7th Cir. 1986). The *Caldwell* court outlined the facts in the following fashion:

> Shortly following the lockdown, prison officials at Marion confiscated all hardbound books in the possession of inmates. Apparently, the inmates were given notice only five minutes prior to the confiscations. Caldwell's personal law and religious books were taken. All inmates, including Caldwell, were told that, at the inmate's option, officials would either (1) send the confiscated books to an inmate's family, (2) donate the books to an outside organization, or (3) destroy them. Caldwell has no family to whom he could have had his books sent, nor did he wish that they be destroyed. He was not given the chance to have the books sent to friends outside Marion. Faced with the available options, Caldwell specified outside charitable organizations to which prison officials could donate the books. Approximately two months later, inmates were once again allowed to keep hardbound books in their cells.

*Id.*

In *Caldwell*, the plaintiff alleged that by not sending his property to the destination of his choice his procedural due process rights were violated. The *Caldwell* court found that it was not necessary to enter into the

rather complex area of procedural due process. Rather, the *Caldwell* court indicated:

> [T]he confiscation of Caldwell's books was not effected in accord with federal prison regulations. Bureau regulations set forth the procedure to be followed by prison officials when confiscating contraband. 28 C.F.R. §§ 553.10–.15 (1985). Under these regulations, "contraband" is defined to include "any item ... which previously has been authorized for possession by an inmate ... [and] altered personal property ... when it is determined to adversely affect institution security, safety, or good order." 28 C.F.R. § 553.12. The regulations provide further that any items of personal property confiscated as contraband are to be inventoried and sorted pending identification by the owner. Thereafter, "staff shall mail such items ... at the inmate's expense, to a destination of the inmate's choice." 28 C.F.R. § 553.13 (emphasis added).

*Id.*

Here, it is clear that these procedures were followed. The prison mailed the appellant's property to his sister, except for the dictionaries. However, the appellant maintains that insofar as the dictionaries failed to arrive at his sister's address, his procedural due process rights were violated. This court finds that the appellant's procedural due process rights were not so violated here. Here, the appellant has a post deprivation remedy available through the FTCA.

On this issue, it is important to freeze the action at issue here to pinpoint the exact moment when the appellant was deprived of his property. After the dictionaries were confiscated by Correctional Officer Whitaker, the appellant's property was to be processed according to the abovementioned procedures. Clearly, these procedures were followed. The appellant's sister received all of the his property except for the dictionaries. Therefore, the authorized procedures for handling confiscated property were followed. There is no evidence that the dictionaries did not arrive because of a prison policy or procedure, rather it appears to have resulted from a random and unauthorized act of a prison employee. Specifically, a prison employee failed to properly assure that the dictionaries were expedited to the appellant's sister according to procedures along with the rest of the appellant's property.

At this point, this claim is similar to *Parratt* and *Hudson.* In *Parratt,* the prison officials negligently lost an inmate's hobby kit in the prison postal facility. Here, the negligence did not attach in the processing and receiving of inmate property, rather, negligence attached when the inmate's property was being processed for expediting. The *Parratt* Court found no due process claim insofar as the state provided an adequate remedy for the deprivation. Here, as in *Parratt* and *Hudson,* on the federal level, the FTCA provides an adequate remedy.[7] This court also notes that in *Parratt,* the Court admonished "the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Id.* 451 U.S. at 539, 101 S.Ct. at 1915. No doubt FTCA is an available remedy here, but *Carlson v. Green* teaches that *may* not be the only remedy.

It is important to recognize that in *Carlson, supra,* "the Supreme Court identified two situations in which damage suits against federal officers for money damages will not be permitted." *Erwin Chemerinsky, Federal Jurisdiction, Relief Against Federal Officers and the Federal Government* at 458. "First, *Bivens* suits are not available 'when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery direct-

---

7. In *Orebaugh v. Caspari,* 910 F.2d 526 (8th Cir.1990), the Eighth Circuit evaluated whether procedural due process was violated when a "correctional officer conducting a routine search of [an inmate's] cell confiscated and destroyed various items [the inmate] had purchased from the prison canteen because they exceeded the number of items allowed in an inmate's cell by prison regulations." *Id.* Insofar as this action was "unauthorized destruction," the court found no violation of due process because of the adequate post-deprivation remedy available.

ly under the Constitution and viewed as equally effective." *Id.* "Second, *Bivens* suits are not allowed where there are 'special factor counselling hesitation in the absence of affirmative action by Congress." *Id.* Even if FTCA does provide an adequate remedy, the reasoning and result in *Carlson v. Green* counsels a cautious approach to the evaluation of claims filed under *Bivens.* Here, the district court reached the right result in part for the wrong reason. There is no basis for a *Bivens* claim with regard to the dictionaries. There was no violation of established constitutional rights either substantive or procedural.

## VI.

There are some remaining issues dependant on these constitutional claims. Insofar as this court has only remanded the claim outlined under section III, this court must also discuss the appellant's claim against certain supervisory officials at Marion. The appellant alleged the following:

> [The] defendants' act, as described herein are part of a *continuous pattern of discrimination, persecution,* and harassment against me, in violation of law, custom, and Bureau of Prison rules and regulations. Supervisory defendants, Norman Carlson (who, upon information and belief, viewed beatings etc. at Marion in · November, 1983), Wardens Miller, Williford, Associate Wardens D.W. Keohane ... are responsible for establishing policies and procedures authorizing the violations stated in this complaint, for ordering them, for supervision them, for not investigating complaints about them, and ultimately for not preventing them....

*See Brief and Appendix of Plaintiff–Appellant* at 23.

▉▉▉▉ The district court dismissed the claims against Warden Miller, Director Carlson, Warden Williford, and Associate Wardens Keohane and Lamer. In so doing, the district court indicated that the above-mentioned defendant-appellees could not be held liable in a *Bivens* action under the doctrine of *respondeat superior* or supervisory liability. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2722, 105

L.Ed.2d 598 (1989). The decisional law is clear that there must be individual participation and involvement by a defendant, and that the concept of *respondeat superior* cannot be the basis of a claim under § 1983. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rascon v. Hardiman,* 803 F.2d 269 (7th Cir.1986); *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *Duncan v. Duckworth,* 644 F.2d 653 (7th Cir.1981); and *Adams v. Pate,* 445 F.2d 105 (7th Cir.1971). *See also Sulie v. Duckworth,* 583 F.Supp. 995 (N.D.Ind.1984), *aff'd,* 767 F.2d 924 (7th Cir.1985). In general, Section 1983 cases and *Bivens* cases are parallel in this regard.

The appellant asserts two more claims here. First, the appellant maintains that supervisory staff can be found liable for directing an unconstitutional policy. Second, the appellant claims the supervisory defendant-appellees also facilitated and ignored the constitutional violations of their subordinates.

For purpose of the first claim, the appellant maintains that the claim of supervisory liability must be seen both in light of what occurred at Marion in late 1983 and the specific allegations made by the appellant in his Complaint. In 1983, the Bureau of Prisons made a decision to lock down the prison. That decision was made in Washington D.C. by the Director of the Federal Bureau of Prisons, Norman Carlson, and was implemented at Marion by the Wardens and Associate Wardens. The allegedly unconstitutional policies outlined by the appellant have been held constitutional, by this court on numerous occasions. Therefore, there is no basis to revisit them here.

The second part of this claim must rise or fall with the specific holding of this court on the constitutional claims in this case. This claim and the claim in section III of this opinion are essentially coextensive. In section III, this court discussed the constitutional ramifications of the cold cell claim. The appellant asserted in his Amended Complaint that Warden Miller, Associate Warden Keo-

hane, and Unit Manager Deer failed to repair the windows in the appellant's cell block. This court is remanding that Eighth Amendment claim for purposes of these officials, except for Deer.[8] On this issue, to effectuate an argument of this nature, liability must be premised on whether the appellant can show how the supervisory officials were deliberately indifferent to the appellant's constitutional rights. Therefore, any claim based on their supervisory capacity for the windows in the cell block is moot insofar as it is duplicative of the claim remanded under section III. Therefore, this court affirms the dismissal of this claim with respect to all of the defendant-appellees including Carlson, Williford, and Lamer.

## VII.

The federal courts in general and the Southern District of Illinois in particular are currently inundated with massive filings of *pro se* prisoner cases making claims under *Bivens, supra,* 42 U.S.C. § 1983, 28 U.S.C. §§ 2254 and 2255, and the Federal Tort Claims Act. These have caused bloated civil dockets which have challenged the federal bench and bar to adopt imaginative techniques for proper disposal under the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471 *et seq.* Notwithstanding all the rhetorical suggestions regarding dispositional techniques for this large category of cases, they remain the bane and achilles heel of many federal district courts, including the Southern District of Illinois. They remain plain hard work for all judicial personnel involved. Notwithstanding the above, a prisoner involved in this species of litigation is entitled to an even-handed application of the accepted substantive law evolving for constitutional tort claims and such procedural rules as Federal Rules of Civil Procedure 12 and 56 respectively. Here, a narrow slice of this plaintiff's elaborate and elongated case must be remanded for further consideration either under Rule 56 or by a trial on the merits. Thus, protracted litigation becomes more so. It is the fervent hope of this court that judicial attention be promptly given to the final loose end of this litigation when it arrives back in the Southern District of Illinois.

For the foregoing reasons, the appellant's claims as outlined by this court in sections III is REMANDED to the district court. The judgment of the district court is AFFIRMED in part, and REVERSED AND REMANDED in part.

RIPPLE, Circuit Judge, concurring.

I believe that the principal opinion has stated the basic principles that ought to govern our disposition of the service of process issue, the "cold cell" issue, and the rectal search issue. With respect to the loss of the dictionaries, I believe that only two points need be made. First, *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), is still the governing law, and an intermediate appellate court ought not hold that the federal Tort Claims Act displaces *Bivens* actions. Second, the allegation with respect to the loss of the dictionaries states a cause of action for negligence. Such an allegation does not state a cognizable claim under the Due Process Clause. *See Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

MANION, Circuit Judge, concurring.

Ronald Del Raine, a prisoner at the United States Penitentiary in Marion, Illinois, sued thirty-four employees of the Bureau of Prisons alleging various violations of his constitutional rights. While the amended complaint is disjointed, it appears that Del Raine alleged constitutional violations based on (1) the alleged cold conditions of confinement; (2) the propriety of, and method of, performing a rectal exam; (3) allegedly unnecessary X-rays; (4) the confiscation of property, including three dictionaries; (5) the refusal to deliver two publications (*The Marionette* and *A New Iron Column*); (6) a strip search and accompanying sarcastic comments; (7) the beating of a fellow inmate; and (8) the cumulative conditions of confinement. The amended complaint also alleged that five defendants were liable for supervising these alleged constitutional violations.

---

**8.** This defendant-appellee was dismissed because the appellant failed to properly serve him and this court affirmed that action in section II of this opinion.

The district court dismissed the claims against twenty-four defendants for failure to effect service. The district court dismissed claims against eight additional defendants, finding that Del Raine's complaint failed to adequately allege constitutional violations. Additionally, the district court granted partial summary judgment to defendant Williford, finding that Williford had not violated Del Raine's constitutional rights by refusing him access to two issues of the publication *The Marionette*.[1] The district court also granted summary judgment to another defendant, Dillow, on Del Raine's claim concerning the propriety of a rectal exam. The district court, however, refused to grant summary judgment on Del Raine's claim concerning the manner in which Dillow performed the rectal exam. This issue proceeded to trial, and at the close of evidence the district court directed a verdict in favor of Dillow, finding that Dillow had not performed the rectal exam in an unconstitutional manner.

Del Raine presents five issues on appeal: (1) whether the district court erred in dismissing claims against twenty defendants for failure to effect service;[2] (2) whether the district court erred in dismissing Del Raine's Eighth Amendment claim concerning the alleged cold conditions of confinement; (3) whether the district court erred in dismissing Del Raine's Eighth Amendment claim concerning the manner in which Dillow performed the rectal exam; (4) whether the district court erred in dismissing Del Raine's claim for confiscation of dictionaries; and (5) whether the district court erred in dismissing claims against five supervisory defendants.[3]

## I. Failure to Effect Service

I concur with the court's decision affirming the dismissal of defendants Brush, Deer, Denton, Gora, Edwards, Sansom, John Doe Guards, Sullivan, Clark, Morrison, Sively, Krajenta, Sheffer, Barker, Westenberger, Williams, John Doe No. 4, Pysher, Thompson, Pool, Trusty and Thomas pursuant to Rule 4(j).

Rule 4(j) provides that

[i]f a service of summons and complaint is not made upon a defendant with 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion.

Fed.R.Civ.P. 4(j).

Del Raine failed to serve these defendants within 120 days of the filing of his amended complaint on November 4, 1985 and Del Raine's only good cause argument is meritless. Del Raine claims that good cause existed for his failure to serve the defendants within 120 days because it is the Marshal's responsibility to effect service. Del Raine, however, did not provide the Marshal with copies of his amended complaint until April 12, 1986, which was more than 120 days after he filed it on November 4, 1985. Therefore, the failure to effect service within 120 days cannot be blamed on the Marshal.

## II. Eighth Amendment Cold Conditions of Confinement

The district court dismissed Del Raine's Eighth Amendment claims concerning the cold conditions of confinement. Here, the court concludes that the district court incorrectly granted summary judgment on this issue. In doing so, the court notes that it is difficult to determine whether the district court dismissed the action under Rule

---

**1.** This court reversed the partial denial of Williford's motion for summary judgment concerning the publication *A New Iron Column* in *Del Raine v. Williford*, 952 F.2d 405 (7th Cir.1992).

**2.** The district court dismissed twenty-four defendants for failure to effect service. Del Raine, however, does not appeal the dismissal of four of the defendants because they were listed as John Does and, therefore, not adequately named.

**3.** On appeal, Del Raine also requests that we "provide a framework for the district court's fair disposition of this case...." The court, apparently finding the request meritless, does not address this issue. I also find Del Raine's request without merit.

12(b)(6) or under Rule 56, but nonetheless concludes that the district court granted summary judgment to defendants on this Eighth Amendment claim. I concur with the court that the district court's decision concerning the Eighth Amendment cold conditions of confinement claims should be reversed, but conclude that the district court's order is more appropriately reviewed as a 12(b)(6) dismissal.[4]

An inmate who alleges an Eighth Amendment violation must show (1) that the deprivation is one of constitutional magnitude; and (2) that the officials in question acted with deliberate indifference. *Hudson v. McMillian*, — U.S. —, —, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter*, 501 U.S. 294, 296, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). "An allegation of inadequate heating may state an eighth amendment violation." *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir.1987). *See Wilson*, 501 U.S. at 303, 111 S.Ct. at 2327 (allegations of a low cell temperature in combination with the failure to issue blankets may be sufficient to state an Eighth Amendment claim); *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir.1991) (there is a constitutional right of prison inmates to adequate heat). For the inadequate condition to be of constitutional magnitude, however, it must be an extreme deprivation; mere discomfort is not enough. *Hudson*, — U.S. at —, 112 S.Ct. at 1000; *Wilson*, 501 U.S. at 298, 111 S.Ct. at 2324 ("The Constitution ... 'does not mandate comfortable prisons'") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

In respect to the cold conditions, Del Raine alleges

Every few days I'm striped (sic) searched in my cell (notwithstanding the bitter cold resulting from the open window above my cell), cuffed behind my back, pulled backwards from my cell, put in an empty cell while cuffed, from fifteen to thirty minutes, ... This practice continues to the present time. On December 23, 1983 while the chill factor was minus 40 degrees to 50 degrees below zero, according to the radio weather reports, I was strip searched and placed in an empty cell ... No hats, jackets, or gloves were allowed, nor could we put a blanket over our cell bars to warm the cell. Many other days were also bitterly cold. Repeated requests to Unit Manager Deer, Associate Warden Keohane, and Warden Miller to close the windows and fix broken ones were futile.

Del Raine's allegations are far from clear on the extremity of the cold. For example, Del Raine does not allege that the *cell* was bitterly cold. He also does not claim that he was denied clothing and blankets. In fact, Del Raine alleges that he was given blankets the day after he requested them. This goes against Del Raine's claim. But "[a] complaint need not narrate all relevant facts or recite the law; all it has to do is set out a claim for relief." *Hrubec v. National R.R. Passenger Corp.*, 981 F.2d 962, 963 (7th Cir. 1992). Moreover, in "reviewing the grant of a motion to dismiss, we must take as true all well-pleaded factual allegations and make all possible inferences in favor of the plaintiff." *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir.1991). Furthermore, "pro se complaints are to be liberally construed...." *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 378 (7th Cir.1988); *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) ("the allegations of the pro se complaint, ... we hold to less stringent standards than formal pleadings drafted by lawyers....").

4. The confusion over the categorization of the motion occurs because the defendants presented the motion as a Motion to Dismiss or in the Alternative Motion for Summary Judgment and Del Raine presented an affidavit, of sorts, in opposition to the motion. Notwithstanding this characterization, in granting the motion, the district court's order does not rely on anything outside of the pleadings. Moreover, the order is framed in terms of dismissal, not summary judgment. For these reasons, I conclude that the district court's order is more appropriately considered as a Rule 12(b)(6) dismissal. *See First Interstate Bank of Nev. v. Chapman & Cutler*, 837 F.2d 775, 777 (7th Cir.1988) (rejecting appellants' contention that the motion to dismiss was converted to a motion for summary judgment because the appellant failed "to point to any matters outside the pleadings that the district court considered with respect to the dismissal for failure to state a claim").

Del Raine's allegations create a possible inference that he was routinely placed in a cell with unreasonably low temperatures and without adequate clothing. Even though the allegations can also be interpreted as only constituting mere discomfort, "[w]hether language in a complaint 'can be interpreted' as deficient is immaterial'" *Hrubec,* 981 F.2d at 963. Rather, a complaint should not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Johnson,* 943 F.2d at 16 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). Applying the standard for 12(b)(6) dismissal and the leniency required of pro se litigants, it is conceivable that Del Raine will be able to prove a set of facts sufficient to demonstrate that the cold was of "constitutional magnitude."

This is still not enough for an Eighth Amendment violation, however; Del Raine must also allege that the prison official was "deliberately indifferent." *Farmer v. Brennan,* — U.S. —, —, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). "Deliberate indifference" requires that "the official knows of and disregards an excessive risk to inmate health or safety...." *Id.* — U.S. at —, 114 S.Ct. at 1979.

Again, Del Raine's complaint is disjointed. With respect to the cold conditions, Del Raine merely alleges that "[r]epeated requests to Unit Manager Deer, Associate Warden Keohane, and Warden Miller to close the windows and fix broken ones were futile." Del Raine, however, also alleges more broadly that the defendants are "responsible for establishing policies and procedures authorizing the violations stated in this complaint, for ordering them, for supervising them, for not investigating complaints about them, and ultimately for not preventing them...." Under the liberal standard of 12(b)(6), read in tandem with the liberal standard governing pro se litigants, "deliberate indifference" is sufficiently alleged.

Del Raine's claims may, however, go quickly on summary judgment because of these problems. For example, if the defendants irrefutably demonstrate that the cell temperature was maintained at a reasonable level, or that sufficient clothing and blankets were provided, or that an accidental mechanical problem caused the cold, summary judgment will be appropriate. *See e.g., Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir.1992) ("If the harm is remote rather than immediate, or the officials don't know about it or can't do anything about it, the subjective component [of deliberate indifference] is not established and the suit fails."); *Wilson,* 501 U.S. at 300, 111 S.Ct. at 2325 ("[I]f a prison boiler malfunctions accidentally during a cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers objectively significant harm."). Nonetheless, dismissal at this point was improper.

## III. Eighth Amendment Claim Concerning the Method of Performing a Rectal Exam

Del Raine also asserts an Eighth Amendment claim against Dillow, contesting the manner in which Dillow performed a rectal exam. The district court directed a verdict in Dillow's favor on this Eighth Amendment claim. The court affirms the directed verdict. In affirming the district court, however, we need not reiterate nor give credibility to Del Raine's argument that "forced digital rectal examinations [should] be ended." Opn. at 33. The continued use of these examinations is not before the court. We also need not consider whether the Fourth Amendment is implicated because Del Raine has not asserted any Fourth Amendment claim. We furthermore need not consider the viability of Del Raine's claim that the Eighth Amendment protects against "psychological harm" because no reasonable jury could have concluded that Dillow performed the rectal exam with deliberate indifference. *See Anderson v. Gutschenritter,* 836 F.2d 346, 348 (7th Cir.1988). I therefore concur only in the affirmance of the directed verdict.

## IV. *Bivens* Action for Loss of Property

The district court dismissed Del Raine's *Bivens* action against Whitaker, Walker and Moralez for their alleged unconstitutional confiscation of property because Del Raine did not first file a Federal Tort Claims Act

action. The district court applied the same rationale to dismiss all other alleged property losses. On appeal, Del Raine asserts that "[t]he only lost property issue to survive dismissal for failure to effect service was against Correctional Officer David Whitaker."[5] I concur with this court's decision affirming the dismissal of the *Bivens* action based on allegedly unconstitutional property deprivations.

Del Raine specifically alleges that "[a] dictionary was taken from me in 1972. Two more dictionaries were taken from me in October, November, 1983...." Del Raine could have attempted to obtain relief for these alleged property losses by bringing a Federal Tort Claims Act action. *See Sellers v. United States,* 902 F.2d 598 (7th Cir.1990). Where an adequate post-deprivation remedy exists, due process is not offended. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer,* 468 U.S. 517, 536, 104 S.Ct. 3194, 3205, 82 L.Ed.2d 393 (1984).[6] Therefore, no due process violation occurred and no constitutional violation underlies Del Raine's *Bivens* claim. Accordingly, I conclude that the district court correctly dismissed Del Raine's *Bivens* action against Whitaker.

## V. Supervisory Liability

The district court dismissed Del Raine's claims against Miller, Carlson, Williford, Keohane and Lamar for supervisory liability concluding that defendants, who are supervisors, cannot be held liable in a *Bivens* action under the doctrine of respondeat superior. *Lojuk v. Quandt,* 706 F.2d 1456, 1468 (7th Cir.1983). While supervisors cannot be held liable under the doctrine of respondeat superior, they can be liable for the conduct of their subordinates if they were personally involved in that conduct. *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988). A superior may be personally involved by formulating and directing an unconstitutional policy, *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986), or by knowing about unconstitutional "conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones,* 856 F.2d at 992.

Del Raine alleged in his complaint that the supervisory staff is "responsible for establishing policies and procedures authorizing the violations stated in this complaint, for ordering them, for supervising them, for not investigating complaints about them, and ultimately for not preventing them...." In his brief, Del Raine argues that the supervisors could be liable for either establishing unconstitutional policies or for being deliberately indifferent to their subordinates' unconstitutional conduct, as alleged in the complaint. Del Raine's complaint alleged numerous purported constitutional violations, including claims based on: (1) the alleged cold conditions of confinement; (2) the propriety of, and method of, performing a rectal exam; (3) unnecessary X-rays; (4) the confiscation of property; (5) the refusal to deliver two publications (*The Marionette* and *A New Iron Column*); (6) a strip search and accompanying sarcastic comments; (7) the beating of a fellow inmate; and (8) the cumulative conditions of confinement. The district court dismissed all of these claims, concluding that the allegations were insufficient to state a constitutional violation. On appeal, Del Raine attacks only the district court's decision concerning the cold conditions of confinement, the rectal exam, and the confiscation of dictionaries. Del Raine has therefore waived any objection to the dismissal of these other claims. The court has rejected all of Del Raine's claims with the exception of the cold conditions of confinement claim. Therefore, the only possible underlying constitutional violation for which supervisory liability may exist concerns the cold conditions of confinement.

---

5. The court accepts Del Raine's assertions, but Del Raine's claims against Walker and Moralez also survived dismissal for failure to effect service. Nonetheless, because Del Raine only challenges dismissal of his claim against Whitaker, he has waived any objection to the dismissal of Walker and Moralez.

6. To the extent that Del Raine is objecting to the classification of dictionary as a non-law book, I conclude that this classification is not arbitrary. Therefore, a due process claim based on this classification must fail. *See e.g., Caldwell v. Miller,* 790 F.2d 589, 609 (7th Cir.1986).

The court concludes that the claims of supervisory liability based on the cold conditions of confinement against Miller and Keohane are redundant because Del Raine alleges an Eighth Amendment violation on the same basis. I agree. Supervisory liability, in this case, could only be based on the alleged deliberate indifference to the cold conditions of confinement. This is identical to Del Raine's Eighth Amendment claim against Miller and Keohane. Thus, I concur with the court's decision concerning Miller and Keohane's supervisory liability. I also concur with the court's decision affirming the dismissal of defendants-appellees Carlson, Williford and Lamar, against whom Del Raine also asserted claims of supervisory liability, because Del Raine's complaint fails to specifically tie these defendants to the alleged unconstitutional cold conditions of confinement.

## VI. Conclusion

For the foregoing reasons, I concur with the court's decision that the only claims which should remain are Del Raine's Eighth Amendment cold conditions of confinement claims against Keohane and Miller.